**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DEVELOPERS SURETY AND
INDEMNITY CORPORATION,

        **Plaintiff,**

v.                                      **Case No. 8:14-cv-425-T-23TBM**

HANSEL INNOVATIONS, INC.,
JEFFREY Z. HANSEL, and
CINDY K. PEARCE,

        **Defendants.**
_____/

### REPORT AND RECOMMENDATION

      THIS CAUSE is before the Court on **Developers Surety and Indemnity Company's Motion for a Preliminary Injunction** (Doc. 10) and Defendants' response (Doc. 15).[1]  Oral arguments on the Motion were conducted on May 14, 2014.  For the reasons set forth below, it is **RECOMMENDED** that the Motion be **GRANTED**.

I.

A.

      Plaintiff, Developers Surety and Indemnity Company (Developers), sues Hansel Innovations, Inc. (Hansel), a Florida corporation, Jeffrey Z. Hansel, and Cindy K. Pearce (collectively Defendants), alleging claims for breach of indemnity agreement (Count I);

---

      [1]The Motion is supported by the Affidavit of Cherie Rondinelli with accompanying exhibits.  (Doc. 10, Exs. 1-7).  Developers also submitted additional affidavits and deposition testimony at the hearing.  (Doc. 21).  Defendants filed the Affidavit of Jeffrey Z. Hansel (Doc. 15-1) and admitted certain email exhibits at the hearing.  (Doc. 22).

specific performance of the indemnity agreement (Count II); quia timet (Count III);

exoneration (Count IV); and common law indemnity (Count V).  (Doc. 1).  Developers is a

California corporation with a its principal place of business in Irvine, California.  It writes

surety bonds guaranteeing the performance of contracts and other bonds required or allowed

by law.  Hansel is a Florida Corporation with its principal place of business in Dover, Florida.

It is a fire sprinkler company owned by Jeffrey Hansel and Cindy Pearce.

 As alleged in the Complaint, on October 1, 2010, Hansel and Archer Western

DeMaria JV III (Archer) entered into a Subcontract Agreement (the Bonded Contract)

whereby Hansel agreed to design, furnish, and install the fire suppression systems at the

James Haley VA Project located in Tampa, Florida (the Project).  On February 4, 2011, as a

prerequisite to Developers' issuance of a bond in favor of Hansel, Defendants executed an

Indemnity Agreement in favor of Developers.  *See* (Doc. 1, Ex. A).  By the terms of the

Indemnity Agreement, Defendants agreed, among other things, that they would

> Indemnify and hold harmless [Developers] from and against any and all
> liability, loss, claims, demands, costs, damages, attorneys' fees and expenses
> of whatever kind or nature, together with interest thereon at the maximum rate
> allowed by law, which [Developers] may sustain or incur by reason of or in
> consequence of the execution and delivery by [Developers] of any Bond on
> behalf of [Hansel] . . .

*Id.* at ¶ 1.  Thereafter, on February 23, 2011, Developers issued Subcontractor Performance

Bond No. 478671P guaranteeing Hansel's performance and completion of the Project (the

Bond).  By the allegations, Hansel began incurring financial difficulties in early 2013 which

impeded its ability to perform and pay for work on the Project (under the Bonded Contract).

Archer made formal demand on the Bond in April 2013.  Hansel requested financial

assistance from Developers.  Developers accommodated Hansel's request but conditioned the

financial assistance on Defendants executing a Financing and Collateral Agreement (the

Financing Agreement).  (Doc. 10, Ex. C).  According to the Financing Agreement,

Defendants acknowledged, among other things, that

> [Hansel's] work contemplated by the Bonded Contract is incomplete, and the
> [Hansel] and the Indemnitors hereby acknowledge and admit that: (a) [Hansel]
> may encounter financial difficulty completing the performance of the Bonded
> Contract; (b) that [Archer] has expressed concerns related to [Hansel]'s ability
> to complete its work required by the Bonded Contract; (c) [Hansel] and the
> Indemnitors have requested the financial assistance of [Developers] as a result
> of (a) and (b) above; and (d) but for the willingness of [Developers] to enter
> into this Agreement, [Hansel] cannot complete the performance of the Bonded
> Contract.

*Id.*  In reliance on the Indemnity Agreement and the promises made by Defendants in the

Financing Agreement, Developers paid Hansel and/or its vendors $128,718.10 for the

completion of its work under the Bonded Contract.  In January 2014, prior to Hansel

completing its work under the Bonded Contract, Archer advised Developers of ongoing issues

with Hansel's work.  Developers requested Hansel to accommodate Archer's demands to

address the issues.  Hansel, however, refused to complete its work required by the Bonded

Contract unless Developers (1) continued to fund Hansel's work, (2) agreed to pursue any

claims against Archer, and (3) released Defendants from personal liability.  Thereafter,

Developers was forced to retain another contractor to complete Hansel's work, incurring an

additional $15,366.93 in expenses.  By the Complaint, there remains work to be done under

the Bonded Contract that can only be completed by Hansel (without Developers having to

incur significant costs).  To date, Defendants have refused to honor their indemnity

obligations.  (Doc. 1).

B.

By its Motion, Developers seeks a preliminary injunction compelling Defendants, jointly and severally, to (1) post $200,000.00 in collateral security and otherwise prohibit all transfers and encumbrances of their assets until they have done so, and (2) grant to Developers full access to their books and records, in accord with Article 14.9 of the Indemnity Agreement.  Developers cites three additional provisions in the Indemnity Agreement to support its assertion that it is entitled to specific performance.  By the first, Defendants are obligated to immediately deposit with Developers collateral security in the event Developers establishes a reserve account to cover its liability under the Bond.  By the second, Defendants agreed that should they fail to deposit the collateral demanded by Developers, Developers may seek a mandatory injunction to compel the deposit of such collateral.  Developers asserts that in accord with the Indemnity Agreement, it established $183,842.65 in reserve, and on February 21, 2014, it demanded that Defendants post $200,000 to cover the reserve and to reimburse Developers for the losses incurred on the Bond.[2]  Defendants have failed to comply with the demand.[3]

---

[2]Developers' breakdown of the $200,000 reserve includes $151,380.45 for losses incurred (e.g. financing Hansel, attorney's fees, investigative fees, costs, and payments to Hansel's vendors); $14, 529.33 for payments that Developers will imminently process (e.g., vendor payments to complete work that Hansel refused to perform); and approximately $34,000 to pay for hiring another engineer to approve changes to the work performed by Hansel and to prepare "as-built" drawings.  (Doc. 10, ¶ 18).

[3]By a third provision, Developers is granted the right of free access to the books, records, credit reports, and accounts of the Defendants for the purposes of examination and copying.

4

Developers asserts that it is substantially likely to succeed on its claims given the clear and certain terms of the Indemnity Agreement which, in addition to indemnity, entitle it to specific performance of the collateral security clause in the face of Defendants' failure to abide by the agreement.  By its argument, courts universally enforce a surety's right to specific performance of such collateral security provisions to assure that the surety has the security provision and remedy for which it bargained.[4]

Moreover, Developers urges that an indemnitor's failure to post collateral security in these circumstances leaves the surety without an adequate remedy at law.  It urges that a money judgment without according the surety the relief of specific performance pursuant to an indemnity agreement is inadequate and irreparably harms the surety by depriving it of prejudgment relief to which it contractually bargained.[5]  Thus, it urges that specific performance at this juncture presents the only method by which Developers can vindicate its bargained-for right to collateral security.

Balancing the harms of granting injunctive relief, Developers urges that while it faces irreparable harm if the Court denies injunctive relief, there is little harm to the Defendants in requiring them to comply with the Indemnity Agreement.  Moreover, the public interest is

---

[4]Developers cites *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.,* 534 F. Supp. 2d 1290, 1322-1323 (S.D. Fla. 2008); *U.S. Fid. & Guar. Co. v. Feibus*, 15 F. Supp. 2d 579, 588 (M.D. Pa. 1998); *Cincinnati Ins. Co. v. Water Equip. Servs., Inc.*, No. 8:07-cv-1641-T-17EAJ, Doc. 32 at 11 (M.D. Fla. July 8, 2008); *Fid. & Deposit Co. of Md. v. Emerald Coast Specialties, Inc.*, No. 5:07-cv-123, Doc. 11 at 1-2 (N.D. Fla. June 28, 2007).

[5]In support, it cites *Liberty Mut.*, 534 F. Supp. 2d at 1321, and *Safeco Ins. Co. of Am. v. Schwab*, 739 F.2d 431, 433 (9th Cir. 1984).

served by enforcing the terms of the contract and by protecting the solvency of sureties whose work is a benefit to the public.

Finally, Developers urges that because there is little harm in granting a wrongful injunction in the circumstances of this case, the Court should not require a bond.  By its account, any collateral security paid would be kept in reserve pending the outcome of the litigation.  Should Defendants prevail, the monies would be returned to them and the only loss would be the interest on the collateral security from the day it was deposited.  Given that Developers is a solvent surety with the means to pay for such modest damages, no bond is necessary.  Alternatively, any bond requirement should be measured by the approximate compound interest amount on $200,000 from the date of posting the collateral.  (Doc. 10).

In response, Defendants present certain of the facts differently.  They generally accept the chronology offered by Developers and do not challenge the terms of the agreements.  They urge that they completed 99% complete of the work required with the only remaining work being the commissioning of the sprinklers and completing the "as-built" drawings for the Project.  They urge that they were forced to withdraw from the Project by Archer's refusal to pay Hansel for over one year, Archer's refusal to approve change orders, and Archer's directing additional work over Hansel's protest.  Defendants claim that they walked off the job in March or April 2013 because Archer refused to accept responsibility for a back-pay award demanded by the U.S. Department of Labor and because Archer was more than 90 days past due on Hansel's invoices.  When Archer made demand on the Bond over the wage dispute, a representative of Developers, Gary Perkins, reached out to Defendants and induced them to sign the Financing Agreement and return to the job.  Defendants claim that Perkins

6

assured them that Developers would assist them in their collection efforts against Archer. Specifically, he suggested that Hansel completed its pipe installation work, Developers and Hansel would then withhold the "as-builts" as leverage to coax payment out of Archer.  But for these assurances, Defendants claim that Hansel would not have returned to the job.  Upon Hansel's return to the job, relations with Archer only worsened and no payments were made. Instead of assisting Hansel in it efforts to get paid, Developers sided with Archer and, in late 2013, stopped making payments to Hansel.  After substantial completion of its work, Archer demanded Hansel turn over its "as-builts."  Contrary to its prior assurances, Developers refused to assist Hansel in collecting the monies owed by Archer.  Defendants assert their belief that Developers and Archer entered a compromise or settlement without Hansel's knowledge or involvement.

Concerning the preliminary injunction, Defendants urge that their bad-faith defense extinguishes Developers' substantial likelihood of success.  By this argument, a surety is not entitled to indemnification where the surety has acted in bad faith.[6]  Thus, Developers' fraudulent inducement of Hansel to return to the job, its failure to assist Hansel in collecting money owed by Archer despite promising to do so, its unilateral defunding of Hansel's work at the eleventh hour, and its demand of collateral security in an amount in excess of the reserve amount all suggest an improper motive and an improper secret settlement between Developers and Archer.  Given that injunctive relief is an equitable remedy, Developers' bad-faith, tantamount to unclean hands, bars the Court from granting this drastic relief.

-------------------------

[6]In support, Defendants cite *Auto-Owners Ins. Co. v. Se. Floating Docks, Inc.*, 571 F.3d 1143 (11th Cir. 2009).

Defendants also urge that Developers is not in danger of irreparable injury. Here, the work is substantially completed, and Developers has a number of remedies including a set-off for financing Hansel and a claim against Archer for its unjustified declaration of Hansel's default. It cannot show that irreparable injury is likely.

Finally, Defendants urge that Developers should be required to post bond despite its claim that it is a large, solvent surety with means.

## II.

Rule 65 of the Federal Rules of Civil Procedure governs the entry of a preliminary injunction. The purpose of a preliminary injunction is to maintain the status quo until the court can enter a final decision on the merits of the case. *United States v. DBB, Inc.*, 180 F.3d 1277 (11th Cir. 1999); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). A party seeking entry of a preliminary injunction must establish (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not granted, (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party, and (4) if issued, the injunction would not be adverse to the public interest.[7] *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established

---

[7]A plaintiff may support its motion for a preliminary injunction by setting forth allegations of specific facts in affidavits. M.D. Fla. R. 4.06(b)(2), 4.06(b)(3). In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

the 'burden of persuasion' as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)).

III.

A.

On the basis of the proffered evidence and review of the applicable case law, Developers is substantially likely to succeed on the merits of its claim for breach of contract. To establish a claim for breach of contract under Florida law, Developers must prove: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (applying Florida law). Here, the parties do not dispute the existence of the Indemnity Agreement or the requirements thereunder. As that agreement relates to the instant dispute, it clearly provides that Defendants are obligated to "indemnify and hold harmless Surety from and against any and all liability, loss, claims, demands, costs, damages, attorneys' fees and expenses of whatever kind or nature." *See* (Doc. 1 at Ex. A, ¶ 1). Defendants' obligation regarding depositing collateral security is also clearly laid out: "[i]f Surety shall establish a reserve account to cover any liability, claim asserted, suit or judgment under any Bond, the [Defendants] shall, immediately upon demand and whether or not Surety shall have made any payment therefor, deposit with Surety a sum of money equal to such reserve." *See id.* at ¶ 3. This provision states further that, "if [Defendants] shall fail, neglect or refuse to deposit with Surety the collateral demanded by Surety, Surety may seek a mandatory injunction to compel the deposit of such collateral together with any other remedy at law or in equity that Surety

9

may have." *Id.*  Here, it appears undisputed that Developers demanded $200,000 from

Defendants as collateral security for a reserve in the amount of $183,842.65 on February 21,

2014.  Unquestionably, Defendants have failed to fund this reserve.  Given the unambiguous

terms of the Indemnity Agreement and the breach thereof, Developers is substantially likely

to succeed on its claim for breach of contract.

As their only defense to the allegations, Defendants argue that Developers has acted

in bad faith such that it is not entitled to indemnification.  Defendants rely chiefly on the

decision in *Auto-Owners*.  There, in addressing the bad faith defense, the Eleventh Circuit

stated:

> We draw from *PSE Consulting* that bad faith requires an improper motive
> or dishonest purpose on the part of the surety.  Moreover, improper motive
> can be evidenced by unreasonable conduct on the part of the surety.
> However, unreasonable conduct, including a negligent investigation of a
> claim, does not by itself constitute bad faith.  Rather, to give rise to an
> inference of bad faith, such conduct must be accompanied by other
> evidence of improper motive, such as a self-interested settlement.  While
> neither evidence of an inadequate and unreasonable investigation nor a self-
> interested settlement standing alone would be sufficient to support a finding
> of bad faith, when coupled together a jury could reasonably infer a surety's
> improper motive.

*Auto-Owners*, 571 F.3d at 1146-47 (citations omitted).  Defendants argue that Developers

acted in bad faith by fraudulently inducing Hansel to return to the Project, ceasing to finance

Hansel's work at the "eleventh hour," demanding excessive collateral, and failing to assist

Hansel in collecting monies owed from Archer.

By the declaration of Jeffrey Hansel, Gary Perkins of Developers induced Hansel to

return to the job on the promise that if it returned to the job, Developers would assist Hansel

in getting monies owed by Archer.  Thus, Perkins proposed that if Hansel completed the pipe

installation, then Hansel and Developers would withhold the as-built drawings to coax Archer

into paying Hansel.  This version is wholly disputed by Developers and flatly denied by

Perkins.  Aff. Perkins (Pl.'s Ex. 3).  While I do not attempt to resolve this dispute on this

Motion, there is some evidence to support Developers' position.  In addition to Perkin's

affidavit, the Financing Agreement, which was concluded after the promise was allegedly

made, suggests no such oral representations were made or relied upon.  Thus, it states,

> THE PRINCIPAL AND INDEMNITORS SPECIFICALLY
> ACKNOWLEDGE AND AGREE THAT THEIR EXECUTION OF THIS
> AGREEMENT HAS NOT BEEN INDUCED BY OR MADE IN
> RELIANCE UPON ANY ORAL OR WRITTEN REPRESENTATIONS
> BY SURETY OR ITS AGENTS . . . THAT THE SURETY WILL
> PROVIDE ANY FINANCIAL ASSISTANCE TO THE PRINCIPAL . . .

(Doc. 10, Ex. C at 7-8) (emphasis in original).  E-mail exchanges also call into question

whether Developers actually agreed to such an inducement as well.  *See* Dep. Hansel, Exs. 6,

9, 11, 13 (Pl.'s Ex. 5), (Defs.' Exs. A and C).  In any event, even if such a promise was made,

I cannot conclude that it necessarily demonstrates bad faith.  Given the stage of the Project

when Hansel balked at doing any more work, getting Hansel to complete the work as opposed

to hiring a third-party appears a reasonable business decision.  Even if it was induced, the

inducement resulted in Hansel returning to complete a job that it was obligated to complete.  I

cannot conclude that Hansel will prevail on this basis.

As for the contention that Developers wrongfully ceased its financing at the eleventh

hour, the evidence reveals that Developers stopped funding Hansel's payroll in November

2013.  At that point, the job was 99% complete and Developers believed that "the payroll

amounts are now small enough that Hansel should be able to absorb the cost."  Dep. Hansel,

Ex. 8 (Pl.'s Ex. 5).  Given Defendants' concurrence that the work was 99% complete, it is difficult to find an improper motive for Developers continuing to fund the reduced payroll.

Most significantly, there is insufficient demonstration of evidence to support that Developers and Archer surreptitiously made a compromise or settlement without Hansel's knowledge or involvement, and to Hansel's detriment.  As stated in *Auto Owners*, to give rise to an inference of bad faith, the surety's conduct must be accompanied by other evidence of improper motive, such as a self-interested settlement.  Here, there is no evidence of such a self-interested settlement by Developers.

In sum, the lack of evidence showing that unreasonable conduct, an improper motive, or self-serving dealings by Developers leads to the conclusion on the proffered evidence that Developers is likely to prevail on its claim for breach of contract and for specific performance.

B.

The traditional standard applicable to preliminary injunctions requires a plaintiff show that in the absence of such relief, it will suffer irreparable injury.  Thus, "[a] showing of irreparable injury is 'the sine qua non of injunctive relief."  *Siegal*, 234 F.3d at 1176.  The asserted irreparable harm must be actual and imminent, rather than remote and speculative.  *Id.*  Cases addressing this requirement in the context of collateral security clauses have concluded that sureties are entitled to specific performance of collateral security agreements by way of injunctive relief.  *See Liberty Mut.* 534 F. Supp. 2d at 1320-21(collecting cases).  Significantly, courts addressing the issue recognize that a surety's loss of its right to collateralization cannot be adequately remedied through monetary damages.  *Id.* at 1321

(citation omitted).  The rationale for specific performance of such collateral security clauses is that "[i]f a creditor is to have the security position for which it bargained, the promise to maintain security must be specifically enforced."  *Safeco*, 739 F.2d at 433 (quotation omitted).  Thus, "the nature of the injury in collateral security provision cases is the lack of collateralization while claims are pending, and nothing can remedy that injury after the fact." *Travelers Cas. & Sur. Co. of Am. v. Indus. Commercial Structures, Inc.*, No. 6:12cv-1294-T-28DAB, 2012 WL 4792906, at *3 (M.D. Fla. Oct. 9, 2012) (citation omitted).  "[T]he use of injunctive relief is appropriate to protect the surety's contractual, common-law and equitable rights of exoneration and *quia timet*."  *Developers Sur. & Indem. Co. v. Elec. Serv. & Repair, Inc.*, No. 09-21678, 2009 WL 3831437, at *2 (S.D. Fla. Nov. 16, 2009) (citations omitted).

Here, Developers bargained for the right to demand Defendants to deposit collateral security in the amount of its reserve to provide security against losses covered by the Bond. Defendants have failed to honor the demand.  As set forth above, the injury in such circumstances is the lack of collateralization while claims are pending, an injury which is not adequately remedied by a later award of money.  Here, the evidence demonstrates that Developers will suffer irreparable harm in the absence of the relief requested.

## C.

Having demonstrated that it will suffer irreparable harm, Developers must also establish that the threatened harm to it outweighs the harm a preliminary injunction may cause to Defendants.  Here, given the finding that case law recognizes irreparable harm in the absence of an order directing specific performance, and given that such order would ostensibly require only that Defendants satisfy their contractual obligation by posting monies

13

which will be held in reserve pending final resolution of the disputes, the balance of harm

considerations favor Developers and the entry of injunctive relief.[8]

D.

Finally, Developers must show the preliminary injunction would not disserve or be

adverse to the public interest.  Here, I concur with the court in the Southern District of Florida

that, "to the extent that the public has any interest in the instant proceedings, such interest

would be in seeing that the contractual agreements between parties are upheld and in the

continued solvency of surety companies for the public benefit." *Developers Sur.,* 2009 WL

3831437 at *2 (citation omitted).

E.

Though Developers has met its burden as to the prerequisites for entry of a

preliminary injunction, the Court may issue a preliminary injunction only if Developers

provides security in an amount the Court considers proper to pay the costs and damages

sustained by any party found to have been wrongfully enjoined or restrained.  Fed. R. Civ. P.

65(c).  The burden of establishing a rational basis for the amount of a proposed bond rests

with the party seeking security.  *Int'l Equity Invests., Inc. v. Opportunity Equity Partners*, 441

F. Supp. 2d 552, 566 (S.D. N.Y. 2006).  The determination of the amount of the injunction

bond, however, lies within the sound discretion of the Court.  *Carillon Imps., Ltd. v. Frank

Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997).  Developers requests that the

---

[8]Defendants do not argue or otherwise demonstrate significant harm which outweighs the harm to Developers.

14

Court require no security or an amount approximating the compound interest on $200,000 from the day of posting the collateral to the estimated day of the judgment.

While the requirement that Defendants post security with Developers is undoubtedly onerous, it is unlikely in such arrangement that Defendants suffer large damages should they prevail in whole or in part in this suit.  Therefore, I find a minimal bond appropriate in the circumstances of this case.

IV.

In conclusion, Developers has carried its burden as to all four prerequisites for entry of a preliminary injunction.  Accordingly, it is **RECOMMENDED** that the Court enjoin Defendants to:

(1) post collateral security with Developers in an amount equal to the present value of the reserve account established on this Bond[9] and otherwise prohibit any transfers and encumbrances of the Defendants' assets until this is done; and

(2) grant to Developers full access to the Defendants' books, record, credit reports, and accounts in accord with Article 14.9 of the Indemnity Agreement.

It is **RECOMMENDED** further that Developers be required to post a bond amount of $5,000.00.

Respectfully submitted this
11th day of June 2014.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

---

[9]Developers shall file with the Court a sworn statement as to the exact amount of the reserve within ten (10) days from the date of this Report and Recommendation.

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6.


Copies furnished to:
The Honorable Steven D. Merryday, United States District Judge
Counsel of Record